# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

---

**David E. Patton**
*Executive Director and*
*Attorney-in-Chief*

**Deirdre D. von Dornum**
*Attorney-in-Charge*

December 7, 2022

**By ECF and hand-delivery**

Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     *United States v. Parveg Ahmed*, 17 CR 378 (AMD)

Dear Judge Donnelly,

Mr. Parveg Ahmed has pled guilty to one count of attempting to provide material support and resources to a foreign terrorist organization, the Islamic State of Iraq and al-Sham ("ISIS," "ISIL," or the "Islamic State"), in violation of 18 U.S.C. §§ 2339B(a)(1) and (d). Specifically, in June 2017, Mr. Ahmed and another person[1] attempted to travel to Syria to join the Islamic State. For the reasons detailed below, a sentence of the 66 months (five-and-a-half years) already served in prison, followed by an additional seven years of supervised release, is sufficient, but not greater than necessary, to comply with the factors guiding federal sentencing.[2]

"[A] court's duty is *always* to sentence the defendant as he stands before the court *on the day of sentencing*." *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002) (emphases

---

[1]     This person was charged separately. His case is currently pending before this Court.

[2]     Mr. Ahmed was arrested in Jordan on June 16, 2017. On August 28, 2017, US law enforcement agents arrested him at JFK airport after he had been deported from Jordan.

*United States v. Parveg Ahmed*
December 7, 2022

added). The 27-year-old Parveg Ahmed that will be standing before the Court on December 20, 2022 is an entirely different person than the naive and brainwashed youngster who contrived to enter Syria almost six years ago. Among other things, Mr. Ahmed has entirely rejected the radical Islamic ideology that once guided him. His sentence should recognize and reflect that difference.

Mr. Ahmed's downfall was his young age and fragile mental state. Parveg was a naive teenager suffering from severe depression who was consistently bullied both at home and at school, making him a classic target and victim of online radicalization. Searching for the comfort and support of God, and not knowing any better, he was indoctrinated by the sermons and speeches of radical Islamists like Anwar al-Awlaki and Abdullah el-Faisal into believing that being a true Muslim required adopting and advocating the tenets of violent jihad advanced by the Islamic State.

As often happens, with increasing age comes increasing wisdom, and there is a world of difference between the 22-year-old who committed the crime and the 27-year-old being sentenced by the Court. In this regard, it is the independent expert opinion of Forensic Psychologist Dr. Kostas A. Katsavdakis that Mr. Ahmed currently poses a low risk of recidivism or danger to the community if released to a half-way house, and that even this low risk can readily be managed through non-incarceratory means such as continued mental health counseling and related treatment. *See* October 27, 2022 Forensic Evaluation Report of Kostas A. Katsavdakis ("Dr. Katsavdakis Report").[3]

While he remains a practicing Muslim, Mr. Ahmed now entirely rejects the type of Islam wrongly espoused by the Islamic State and its supporters. He is deeply ashamed and remorseful

---

[3]    Dr. Kostas A. Katsavdakis has a PhD in Forensic Psychology and is a member of the American Board of Professional Psychology. To reach his conclusions, Dr. Katsavdakis reviewed multiple records and reports related to Mr. Ahmed's history and treatment, and personally met and evaluated Mr. Ahmed on two occasions at the MDC and several times by videoconference. *See* Dr. Katsavdakis Report at 1 (Course of Evaluation). The report is attached as Exhibit A.

*United States v. Parveg Ahmed*
December 7, 2022

for his prior radical beliefs, and for the harm his prior actions caused others and his family, including the harm he might have caused if he had managed to enter Syria or contact ISIS once there. He has been in therapy, voluntarily and successfully, since April 2021. This therapy has concentrated on, among other things, how and why he was led astray, so Mr. Ahmed can help prevent others from making the same mistake. He also works to decrease violence in his Unit at MDC Brooklyn ("MDC"). Upon his release, he will, with the support of his family, live a quiet and law-abiding life as a productive member of society.

There is much to recommend about the Parveg Ahmed of December 2022. As the letters and documents accompanying this memorandum attest, he has put in the hard work and effort necessary to change, and he has truly turned his life around. Hence, the sentencing goals of specific deterrence and rehabilitation have already been met, and the sentencing goals of general deterrence and punishment also are met by the requested sentence of time served and supervised release— especially considering the terrible conditions under which Mr. Ahmed has been held since his arrest, both in Jordan and at MDC. Indeed, imposing a sentence that accounts for Mr. Ahmed's genuine remorse and successful rehabilitative efforts will encourage other offenders and potential offenders to reform and reject violence, just as Mr. Ahmed has done.

For these reasons, and the others discussed below, the Court should sentence Mr. Ahmed to the 66 months he already has served in prison, followed by 84 months of supervised release. Such a sentence, totaling 151 months, accords with the parsimony principle that guides federal sentencing and is the proper and sufficient sentence for Mr. Ahmed.

# BACKGROUND[4]

## Parveg Ahmed

Parveg's unsuccessful attempt to enter Syria was the final act in a radicalization process that began while he was still in high school. "Mr. Ahmed's seeds for terrorist targeted violence emerged in the context of a dysfunctional family, undiagnosed mental health problems, social/intimate relationship deficits and escalating failures across multiple domains." (Ex. A at 5). Beset by deep depression, desperate for positive affirmation and a place to belong, and having been bullied and abused his entire life, Mr. Ahmed quickly fell for the persecution narrative and invitation to join a greater "Caliphate" movement being offered online by radical Islamist preachers.

Parveg Ahmed is the second oldest of four children born to Bangladeshi immigrants, Abdul Hannan and Asma Begum. (PSR ¶ 32). Parveg was born in Sylhet, Bangladesh, but he moved to the United States with his parents when he was an infant and is a United States Citizen. (PSR ¶ 37). Parveg had a difficult childhood. His family was poor. While his father worked long hours as a food vendor, there never seemed to be enough, leading to constant financial pressure and the family having to move from place to place in Queens and Brooklyn during Parveg's formative years. It was not until Parveg was eight years old that the family, while still poor, found enough financial stability to relocate to an apartment in Ozone Park, Queens where the family still lives.

Parveg's father was a disciplinarian. (PSR ¶ 34). More than that, he reacted to the pressures

---

[4] The factual bases for Mr. Ahmed's sentencing request are found in the PSR and the following attachments:  Exhibit A—Dr. Katsavdakis's report; Exhibit B—a letter addressed to the Court from Mr. Ahmed; Exhibit C—letters from Mr. Ahmed's family and friends; Exhibit D—certificates of achievements from MDC; Exhibit E—letters from residents of MDC; Exhibit F—a letter and transcript from a paralegal certificate program completed by Mr. Ahmed; Exhibit G—a letter from Dmitri Oster, licensed social worker; and Exhibit H—a letter from Lisa McDermott, Mr. Ahmed's current licensed mental health counselor.

he faced, and seeing his children becoming Americanized, by physically and emotionally abusing his children. *Id.* Parveg often bore the brunt of his father's abuse. Parveg was regularly beaten until he was twelve years old. *Id.* Worse than the physical abuse was his father's "tremendous verbal abuse," which did not stop. *Id.* "[T]hroughout his childhood his father taunted him, called him names, and mocked him." *Id.* Parveg "woke up to 'verbal abuse and went to sleep with verbal abuse.'" *Id.* His father's abuse at home was compounded by several instances where he was sexually molested by male friends of the family and by the bullying Parveg experienced in school, particularly in middle school. (Ex. A, addendum A at 12). Socially awkward and lacking in self-confidence, Parveg became a magnet for abuse. He was constantly mocked for his weight, race, nationality, and hygiene. Almost every day at school he was picked on and called "ugly," "fat," "squarehead," "Parfag," and "Parfag germs" by his peers. (PSR ¶ 34).

Smart and studious, Parveg always did well in school. While he ultimately was not chosen, he made it to the finals of the Prep for Prep program, and later tested into Stuyvesant High School, one of New York City's top public schools. (PSR ¶ 49). Parveg had hoped that getting into Stuyvesant would prove his worth to his father, but nothing really changed. His father continued to belittle and abuse him, letting Parveg know every day that he was a failure and a disappointment to his family. (PSR ¶ 42).

Parveg became increasingly depressed and anxious, exhibiting clear signs of the clinical depression that ran in his family, such as sleeping all day and retreating from friends and family. (PSR ¶ 42). Absent any real or lasting treatment, Parveg's mental health problems increased. He started cutting class, became disruptive when in school, and abused a variety of drugs, including alcohol, Xanax, codeine, LSD, mushrooms, and marijuana, which he smoked daily from 15 years old to 19 years old. (PSR ¶ 44). Parveg explains: "The bullying I had endured in middle school

and at home began surfacing as depression and anxiety, so I turned to drugs (mainly marijuana) to cope with all the negative feelings, but that only made it worse. In my youth and drug-induced haze, I didn't much care about all the classes I began failing." (Ex. B at 1). In September 2014, Parveg, who had been a high academic achiever his entire life, barely graduated from Stuyvesant, finishing with a cumulative G.P.A. of 65.95. (PSR ¶ 49).

Because his father would not accept him as a man," Parveg became "'desperate to find manhood – through girls, drugs, sports, fighting, etc.'" (PSR ¶ 42). When none of that seemed to work, he "looked for direction and guidance" from religion. While his family is proudly Muslim, they are more culturally Muslim than practicing Muslims. Looking for guidance on how to be a proper Muslim, Ahmed began watching ISIS videos and sermons online. Many of these online ISIS videos showed ISIS members helping the poor and downtrodden; they were skillful propaganda productions, designed to fool the ignorant and desperate like Parveg Ahmed. "Thinking they were pious Muslims, I fell for their propaganda, seeing that they were quoting the Qur'an but not realizing it was improperly interpreted and believing their historical facts, not realizing it was their fanciful spin on history." (Ex. B at 1). To his terrible regret and shame, Parveg swallowed the ISIS line.

After high school, Parveg continued to drift. He studied computer science at Hunter College from January 2014 to July 2015, before being expelled because he had a 1.9 G.P.A. (PSR ¶ 48). Then, from September to December 2016, he studied computer science at the New York City College of Technology but quit after just one semester. (PSR ¶ 47). Trapped in what seemed to him to be a never-ending cycle of failure, depression, and desperation, Mr. Ahmed clung tighter and tighter to the ISIS narrative and the sense of empowerment it gave him as "somebody who had failed at most aspects of his life and was now being told his failures were due to a world-wide

conspiracy against Muslims." (Ex. B at 1).  Just six months after quitting college, Parveg left the

U.S. and traveled to the Middle East to try to join the Islamic State.

**The Offense Conduct and Advisory Guidelines Term**

On June 20, 2018, Mr. Ahmed pled guilty to one count of attempting to materially support

a designated foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B(a)(1) and (d). (PSR

¶¶ 1 and 13). The specific conduct at issue – expressing support for ISIS in social media and

eventually traveling from Saudi Arabia to Jordan with the intent of entering Syria and joining ISIS

– took place almost entirely before Mr. Ahmed turned 22 years old. He was arrested in Jordan the

day after his 22nd birthday.

The PSR finds an advisory guidelines term of 240 months in prison. (PSR ¶¶ 60-61).[5]  Mr.

Ahmed agrees to this guideline calculation, and indeed stipulated to it in the plea agreement.

However, he did not play an aggravating role in the offense and therefore objects to the 2-level

enhancement found at PSR ¶ 16. Neither Mr. Ahmed nor the person he traveled to Jordan with can

accurately said to have led or recruited the other.[6] They had had hatched the plan between

themselves with neither playing a dominant or leadership role, and were arrested in Jordan together

after trying to enter Syria. In any case, the enhancement has no effect on the applicable guideline

---

[5]    Pursuant to USSG § 5G1.1(a), where the statutory maximum sentence is less than the applicable guideline range, it "shall be the guideline sentence." As to criminal history, this is Mr. Ahmed's first and only offense; he has no prior arrests or convictions. (PSR ¶ 27). However, his criminal history category was raised from I to VI pursuant to USSG § 3A1.4(b). *Id.*

[6]    The purported evidence that probation and the government rely on to support this enhancement is either conclusory, incorrect, or not indicative of leadership. As an example, PSR ¶ 11 states that Mr. Ahmed "recruit[ed] the co-conspirator to travel with him an to join ISIS," but provides no factual basis for this assertion. As another example, Mr. Ahmed did not take "the lead in planning and organizing the trip," as stated in ¶ 11. Prior to their arrest in Jordan, Parveg and the other person arrested traveled to Saudi Arabia from New York with Mr. Ahmed's father and maternal uncle for Umrah (an Islamic pilgrimage to Mecca). The travel plans were made by Mr. Ahmed's father and uncle, who were never aware that the younger two men planned to attempt to enter Syria.

range, which stands at 20 years with or without the unwarranted 2 points.

For the many reasons discussed herein, this purely advisory guidelines term is neither necessary nor appropriate here.

**Mr. Ahmed's Remorse, Rehabilitation, and Lack of Future Risk**

This is a story of ruin *and redemption*. Since his arrest and incarceration, Mr. Ahmed has used his years in prison wisely and well. Among other things, his continued study of his faith has led him to squarely and utterly reject his prior support of violent extremism and those, like ISIL, that use Islam to justify their terrorism.

At the time of his offense, Mr. Ahmed was new to the practice of his faith and relatively ignorant as to its proper tenets and history. In his years in jail, Mr. Ahmed has studied Arabic, the Qur'an, and the history of Islam and the Middle East. Those studies have allowed him to "see clearly the fallacies of ISIS ideology" and "the fallacies of ISIS' history lessons." (Ex. B at 6). With his deeper understanding of his religion, he can now

> clearly see that ISIS is full of hot air, wrong interpretations, and lies. In the future, I would like to help disseminate more information refuting them so that other naive, young Muslims don't get caught up in their madness. … They [ISIS] are a nihilistic, destructive group who can't be reasoned with. I'm ashamed I previously aligned myself with them and all the cruelty, violence, and bloodshed they bring to the world, and I am terribly sorry that I tried to make myself an instrument to such horrors..

*Id.*

There is no question that Mr. Ahmed's years in jail have fundamentally changed him. As he explains:

> I also learned tolerance in jail. After I became radicalized, I stayed away from everyone who wasn't Muslim. Coming to jail, I had to live with people from different cultures, religions, and backgrounds. Although at first, I definitely struggled, I soon began to enjoy bunking with people of different backgrounds: I've stayed with Russians, Chinese, Koreans, African Americans, White Americans, Africans, Hispanics and everything in between. I've shared a cell with people who were Sikh, Jewish, Christian, Muslim, and even Atheists. I always asked a lot of

questions and tried to learn about all the different cultures. It's one thing to read
about culture in a book, but it's a whole other thing to live with somebody immersed
in the culture their whole lives. While it strengthened my faith in Islam, these
interactions made me learn to respect and empathize with the different peoples of
the world.

(Ex. B at 3).

An integral part of Mr. Ahmed's rehabilitation and ongoing recovery are the counseling

sessions voluntarily undertaken by him. He has been in regular counseling – first with Licensed

Clinical Social Worker Dmitri Oster from April 12, 2021 to July 29, 2022, and then with Licensed

Mental Health Counselor Lisa McDermott, commencing in October 2022 – to identify and deal

with the factors that led to his offense.[7] LCSW Oster writes: "Since beginning his treatment, client

has [been] open and honest in discussing his predicament and makes productive usage of his

counseling sessions by reviewing and speaking about his past actions … appears to be taking

measured steps to disassociate himself from all types of violent ideologically-driven and jihadi

movements … [and] committed himself to those actions vis-à-vis his positions (Imam) within the

MDC and as an individual person of faith.". (Ex. G at 2). This analysis is echoed by Mr. Ahmed,

who states that his sessions with Mr. Oster "played a major role in my improved mental health &

self image," and that Mr. Oster "helped me to understand how religion could play a positive role

in my life, simply without the aggression, intolerance, and the black/white mentality I had

previously attached to it." (Ex. B at 3). Indeed, having studied and learned enough to be his Unit's

Imam, Mr. Ahmed now leads daily prayers and gives weekly sermons to his congregation. His

sermons reject radicalism in all its forms, focusing on how a Muslim should remain humble and

---

[7]     Mr. Ahmed began counseling in late 2019 with Rebecca Weiser, LMSW, but these sessions
ended after the pandemic began in Spring of 2020.

avoid conflict. The leadership and responsibility inherent in being an Imam has played a pivotal role in Mr. Ahmed's maturation and growth. He "was forced to learn how to inspire others, keep people together, and resolve conflicts," and he does his best to lead by example and make the Unit "into a place of peace and civility." (Ex. B at 4).

Mr. Ahmed's hard work and efforts have fundamentally transformed him. He no longer believes violence, religion-based or otherwise, is an appropriate response to any dispute or disagreement, and he has found his self-worth in learning how to cook and clean, in self-improvement, in continuing his education, and in learning how to push through hardship. *See generally* (Ex. A *and* B). Importantly, in the expert opinion of Dr. Katsavdakis, these sincere changes in Mr. Ahmed's attitudes and beliefs means he currently poses a low risk of recidivism or danger to the community, a low risk that can be readily managed through non-incarceratory means, such as continued mental health counseling and related treatment:

> It is this examiner's opinion that Mr. Ahmed, based on the integration of the prior and current assessment process, currently poses a low risk for further terrorist targeted violence. …
>
> … Mr. Ahmed's current low risk for targeted violence can be managed via continued outpatient treatment, employing supportive cognitive-behavioral tactics, alongside supervision and residing in a half-way house prior to residing on his own. This examiner does not recommend a return to his home in Queens given the unstable environment. Mr. Ahmed remains receptive to 1:1 counseling but the process, as indicated in the prior Report, will be slow as he tends to present himself in an overly favorable light. Moreover, his eagerness to marry should be carefully monitored as it may serve as a further psychosocial stressor. It remains this examiner's opinion that a pharmacological assessment and/or intervention be considered to manage emerging depressive and anxiety related symptoms. Finally, the participation of a substance use program is strongly recommended.

(Ex. A at 5).

Dr. Katsavdakis's recommendations are welcomed by Mr. Ahmed, who has given careful thought and planning to how he will continue his positive growth upon release from prison. He understands that, as recommended by his therapists and Dr. Katsavdakis, his life outside prison is

best begun at a halfway house, and that he must continue therapy. In this regard, he intends to

continue therapy with LMHC McDermott and obtain additional therapeutic assistance through the

Department of Probation and enrollment in the DEEP program upon release. *See* December 6,

2022 Letter from LMHC Lisa McDermott to Court (Ex. H) .

In addition to continued therapy, Mr. Ahmed plans for his future includes education. Mr.

Ahmed continued studying and taking classes in prison. He enrolled in and completed many of the

sparse educational opportunities available at MDC. (Ex. C *and* D). He also tutors other inmates

studying for their GED. *Id.*

One of Parveg's proudest achievements was completing a paralegal certification course

while incarcerated, because it showed how far he had come and how much he had changed. He

explains:

> But my biggest challenge was the Paralegal Certificate Course I enrolled in. It was
> 31 tests long and consisted of long and densely-worded workbooks to learn from,
> full of new vocabulary and new concepts. While I started out strong, near the
> middle, that familiar boredom, procrastination, and desire to quit crept in. I almost
> gave up at one point, but when I realized that I would be doing what I had done
> throughout my life, I struggled through and kept pushing, willing myself to the
> finish line. It might not mean much to others, but that Paralegal Certificate is the
> accomplishment I am most proud of. It was tough material and I wanted to quit, but
> I was finally able to persevere to the end of a project. It gives me great confidence
> knowing I completed it, feeling like I now both know and HAVE what it takes to
> accomplish anything!

(Ex. B at 4). After his release, Mr. Ahmed would like to take computer coding courses, and this

time keep pushing until he succeeds:

> When I get out, the first thing I want to do is take a Computer Coding Course. I
> enjoyed the coding class I took in college and can see myself excelling at it with
> enough study. I hope the coding course will allow me to develop invaluable, in-
> demand skills which would allow me to have a stable career and source of income.
> If that is not available, then I would look into some technical training, such as
> electrician or HVAC courses. After securing a job, I would like to get married and
> have kids. The plan after that is to focus on my family, but also write part-time, so
> that I can fulfill my dreams of publishing books. I have had a zeal for God and
> religion ever since I started practicing, and this is partially what led me to fall for

ISIS propaganda. Now I feel I have a much healthier way to express this zeal: writing books on God & religion, helping others to develop that same love that I have for them. I know I still have a lot to learn about life, but I believe that I have the necessary humility and determination to learn and grow. I look forward to the next chapter of my life.

(Ex. B at 7).

Despite his troubled history with certain members of his family, Mr. Ahmed is deeply sorry for the pain he has caused them. *See* Ex. B at 2 ("what hurt me the most [in being arrested and imprisoned] was seeing how much I hurt my family"). Indeed, knowing the pain he had caused his family was a primary motivator for his decision to try to fix his life and turn things around. *Id.* He is determined to lead a law-abiding and responsible life so that he will never shame or hurt them again.

Mr. Ahmed summarizes the many changes he has effected in the years since his arrest – changes that strongly support the requested non-guidelines sentence – as follows:

Your Honor, I have made a strong effort to change. Today I always try to be a positive influence on those around me. . .  I only ask that you give me a second chance and show leniency at sentencing. I promise you that you will never regret it.

(Ex. B at 7).

## ARGUMENT

### A.    The Legal Standards for Sentencing

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013).  That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." *Id.; see also, e.g., Pepper v. United States*, 562 U.S. 476, 493 (2011); *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *United States v. Ministro-Tapia*, 470 F.3d 137, 142

(2d Cir. 2006).

In determining such a sentence, the sentencing court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. *Id.*, 18 U.S.C. § 3553(a)(1). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. *Id.*, 18 U.S.C. § 3661.

While the sentencing guidelines comprise one factor for this Court to consider, they are only one such factor, and "truly are advisory.'" *Douglas*, 713 F.3d at 700 (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). This Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009). Here, an individualized assessment of the § 3553(a) factors (and application of the parsimony clause) support the requested sentence of time served (66 months), followed by seven years (84 months) of supervised release.

**B.      The 3553(a) Sentencing Factors Strongly Support the Requested Non-Guidelines Sentence**

As detailed above, Mr. Ahmed's personal characteristics and history support the requested non-guidelines sentence. Federal courts have long recognized that the "significant gaps" in maturity and pernicious vulnerability to outside influence that so affect the young are relevant to sentencing. *Miller v. Alabama*, 567 U.S. 460, 471 (2012); *Gall v. United States*, 552 U.S. 38 (2007)

(holding that "it was not unreasonable for the District Judge to view [21-year-old] Gall's immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future"); *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (finding, in the case of a 19-year-old convicted of murder, that there "is no dispute that a defendant's youth is a relevant mitigating circumstance. ... Our cases recognize that 'youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage'") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)). It is evident that Mr. Ahmed is a good person who was dangerously misled by ISIS's lies as a teenager and young adult. At the time, he was deeply vulnerable to those lies because of years of physical and emotional abuse, mental health problems, and resulting failures, all of which were unaddressed at the time. (Ex. A at 5).  Science makes clear that there are "fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence." *Graham v. Fla.*, 560 U.S. 48, 68 (2010) (citations omitted). In addition, adolescence is a period characterized by increased impulsivity, risky behaviors, and reward-seeking as a result of the asynchrony in the development of the affective and cognitive centers of the brain. The affective centers of the brain mature immediately in early adolescence, igniting heightened reward-seeking behaviors, while the cognitive control centers which increase self-regulation competence develop more gradually, reaching maturity in the mid-20s.  Consequently, adolescents experience greater urges to pursue reward and weakened capacities to inhibit such actions at the same time. The combination of heightened attentiveness to rewards and still-maturing impulse control makes middle and late adolescence a period of greater risk-taking than any other stage of development, with the riskiest behaviors occurring between 18 and 21.  Because adolescents at this age are at

the threshold of their independence, much of these risky behaviors are unmonitored by adults, making this a very vulnerable period in every teenager's development.[9]

In the years since his arrest, Mr. Ahmed has taken, and continues to take, concrete steps to address the circumstances that made him susceptible to radicalization and has fundamentally changed for the better. It is this better man, and not the "arrogant and ignorant man-child" who committed the offense (Ex B at 1), that must be individually considered and then sentenced by the Court. *See United States v. Rose*, 379 F. Supp. 3d 223, 233-234 (S.D.N.Y. 2019) ("the district court [must] be able to consider the most recent evidence of a defendant's life and characteristics, which may be the most probative information available, when deciding whether a defendant should continue to be incarcerated or, in some cases, be immediately released"); *Pepper v. United States*, 562 U.S. 476, 477 (2011) (holding that, for sentencing purposes, it is the "most up-to-date picture of [a defendant's] history and characteristics" that should be treated as fundamental).

Today, Mr. Ahmed "take[s] full responsibility for [his] actions" (Ex B at 1) and is "very remorseful for his criminal conduct." (PSR ¶ 37). He has rejected his prior radical beliefs and is committed to leading a law-abiding and even exemplary life, as demonstrated by his voluntary entry into counseling while incarcerated and efforts to decrease and resolve conflict and violence in his cell block. *See* Ex. B *and* E. Mr. Ahmed's history in detention – five years of moderation and trying to follow a path of peaceful growth and education – provides strong evidence of successful rehabilitation. It also strongly evidences that Mr. Ahmed presents little risk of recidivism or community danger if he completes the rest of his sentence under supervised release. *See United States v. Jones*, 2021 U.S. Dist. LEXIS 60632 (D. Conn 2021) (defendant's "efforts

---

[9]     Steinberg L. A Social Neuroscience Perspective on Adolescent Risk-Taking. *Dev Rev*. 2008;28(1):78-106. doi:10.1016/j.dr.2007.08.002

toward rehabilitation support the conclusion that he has a low risk of recidivism and therefore that his release does not pose a risk to public safety").[10] Simply put, Mr. Ahmed will not re-offend. *See, e.g.*, Ex. A at 5. Moreover, continuing counseling and treatment during the seven years of supervised release that would follow his release dovetails with the sentencing goal of providing a defendant with needed educational or vocational training, medical care, or other treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Thus, Mr. Ahmed's history and individual characteristics strongly support the requested non-guidelines sentence.

Likewise, the sentencing goals of specific deterrence and rehabilitation already have been met here. Mr. Ahmed's (i) wholesale and sincere rejection of his prior radical beliefs; (ii) efforts to aid and counsel his fellow inmates; (iii) genuine remorse and acceptance of responsibility for his actions; and (iv) entry into voluntary counseling to understand the sources of his prior mistaken choices all demonstrate that Mr. Ahmed has turned his life around. He is committed to maintaining progress and continuing to achieve in the future. He has a plan for success outside of prison and is fully supported in that plan by his family. In any event, Congress has recognized that "imprisonment is *not* an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a) (emphasis added). Indeed, correction and rehabilitation are best addressed in this case not by adding additional years to the five-and-a-half years already served, but by allowing Mr. Ahmed to lead a quiet and law-abiding life under supervised release with continued treatment.

As to incapacitation and punishment, the requested non-guidelines sentence is sufficient punishment given his reformation. While well below the advisory guidelines range, Mr. Ahmed

---

[10]     *See also United States v. Vargas*, 502 F. Supp. 3d 820 (S.D.N.Y. 2020) ("because of the seriousness of Mr. Vargas' past conduct, his rehabilitation is critical to the court's finding that [he] likely does not pose a danger to the public"); *United States v. Core*, 125 F.3d 74, 75 (2d Cir. 1997) ("We find nothing in the pertinent statutes or the Sentencing Guidelines that prevents a sentencing judge from considering post-conviction rehabilitation in prison as a basis for departure.").

already has spent 20% of his life in jail paying for his actions, and he would be sentenced to an additional seven years of supervised release. In this regard, the United States Supreme Court has emphasized that supervised release "is not merely 'letting an offender off easily,'" *Gall v. United States*, 552 U.S. 38 (2007), because supervised release involves "substantial restrictions on freedom" that effectively deter and punish in their own right. *Id.* Under the requested sentence, Mr. Ahmed would serve 151 months – over twelve years – as punishment for his actions as a young man.

Further, conditions at the MDC during Mr. Ahmed's time there have been nearly unbearable at times, increasing the punitive nature of his confinement. Not only has Mr. Ahmed had to endure the degraded conditions at MDC resulting from the COVID pandemic; he was also there during the weeklong blackout in early 2019. For years now, he has been subject to "onerous lockdowns and restrictions" originated to limit the spread of the virus within BOP facilities. *See United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020). Recently, the BOP again imposed a nationwide lockdown restricting all movement, including legal visits, in response to an incident in a BOP facility in Texas.[11] Regardless of the rationale behind such lockdowns and restrictions, it cannot be denied that the sentences of those incarcerated at this time are "harsher and more punitive than would otherwise have been the case." *Id*. *See also United States v. Hatcher*, 2021 WL 1535310, at *3 (S.D.N.Y. Apr. 19, 2021); *United States v. Mcrae*, 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021); and *United States v. Ciprian*, 2021 U.S. Dist. LEXIS 18698, at *8 (S.D.N.Y. Feb. 1, 2021.)  Mr. Ahmed was also held for more than 2 months in solitary confinement in Jordan prior to his deportation and subsequent arrest in the United States. The deleterious effects of solitary confinement, even for a relatively short period, are well-researched and well-known.

---

[11]        https://www.nytimes.com/2022/01/31/us/politics/ms13-texas-prison-fight.html.

*See, e.g., Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017) (Solitary confinement "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term damage. . . There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects.")

As for general deterrence, the requested sentence will generally deter others who are considering making the same type of mistake as Mr. Ahmed. Studies have shown that it is the arrest that best deters, not the length of the sentence.[12] Here, Mr. Ahmed's neighbors, associates, and community already have seen him arrested and imprisoned both overseas and in the United States. Mr. Ahmed has been locked away over five years and will be under supervised release for seven years more – a sentence that is more than enough to deter others.

By contrast, the guidelines sentence advocated by the government violates the parsimony principle guiding federal sentencing because it is far greater than necessary to punish Mr. Ahmed or deter others. Indeed, a longer sentence would be self-defeating and contrary to the sentencing goals. It would be a message to others that even the best efforts to rehabilitate and reject radical Islam and become a lawful, contributing member of society will be ignored, or have little impact, at sentencing. Ignoring or giving short shrift to Mr. Ahmed's rehabilitation and change of heart, as the government may well urge, could be twisted by others to feed into the radical narrative that Muslims will always be hated, persecuted, and unfairly treated in the West. Imposing a non-guidelines sentence based on who Mr. Ahmed is today is not only required of the Court (*Quintieri*,

---

[12]     See Valerie Wright, THE SENTENCING PROJECT, DETERRENCE IN CRIMINAL JUSTICE: EVALUATING CERTAINTY VS. SEVERITY OF PUNISHMENT, 5-6 (2010), http://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf.

306 F.3d at 1230), it will strongly encourage others to make the same positive choices and strides as Mr. Ahmed. Moreover, having Mr. Ahmed out in his community condemning violent extremism will do far more to deter others than sentencing him to more years in prison.

In *United States v. Ahmed*, No. 1:15-cr-00049 (D. Minn.), the court sentenced the defendant to ten years for attempting to travel to Syria to join and fight with ISIS. Importantly, the sentencing court recognized that the sentencing focus must remain on the defendant being sentenced, rather than ISIS, and that, even in cases involving ISIS, the proper sentence remains one sufficient, but not greater than necessary, to "deter others from committing similar crimes, ensure the safety of the public, and avoid unwarranted sentencing disparities." *Id.* Here, the requested non-guidelines sentence readily meets each of those sentencing goals; any additional time in prison would be greater than necessary.

**C.**   **Sentencing Mr. Ahmed to a Guidelines Sentence Would Create an Unwarranted and Inappropriate Sentencing Disparity**

The sentence imposed by this Court must avoid unwarranted sentence disparities among similarly situated defendants. *See, e.g.*, 18 U.S.C. § 3553(a)(6); *United States v. Stevenson*, 834 F.3d 80 (2d Cir. 2016) (acknowledging requirement); *United States v. Frias*, 521 F.3d 229 (2d Cir. 2008) (same). The 20-year prison sentence suggested by the Guidelines, and urged by the government, would create such an improper disparity because it would be far greater than those meted out to others convicted of similar terrorism-related conduct.

For example, in *United States v. Delowar Hussain,* 19 CR 606 (S.D.N.Y.), Judge Stein, after trial, imposed a sentence of 7 years on a man intent on traveling to Afghanistan to provide material support to the Taliban while American military forces were still present in that country.

In *United States v. Dakhlalla*, 15 CR 98 (N.D. Miss.), the court imposed an eight-year sentence for conspiracy to travel abroad to join ISIS. Notably, in imposing that sentence, the court

specifically noting the defendant's youth, lack of criminal history and contrition – three important factors that are equally present here.

In *United States v. Ahmed*, No. 1:15-cr-00049 (D. Minn.), the defendant was sentenced to ten years where he and others attempted to travel to Syria to join and fight with ISIS. In imposing that ten-year sentence, the Court noted that, while ISIS was "one of the most dangerous and violent terrorist organizations the world has ever known," a 10-year prison sentence was sufficient to "deter others from committing similar crimes, ensure the safety of the public, and avoid unwarranted sentencing disparities." *Id.*

Indeed, defendants convicted of far more egregious conduct than that committed by Mr. Ahmed still received sentences far less than the 20-year sentence the advisory guidelines calculate here. In *United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014), for example, the Second Circuit upheld a nine-year sentence in a terrorism case where the defendant "*for more than six years* provided material support to a terrorist organization by purchasing on its behalf *more than $20 million in deadly merchandise . . .* used to injure, murder, maim, not only military but civilians." *Id.* at 260 (emphases added). Likewise, in *United States v. Stafford*, 2016 U.S. Dist. LEXIS 142752 (N.D. Ohio 2016), Stafford was a member of a domestic terrorist cell that conspired to attack various financial institutions, urban infrastructure, and police. One such target was a bridge located just outside of Cleveland. Stafford and his co-conspirators purchased fake C-4 explosives from an undercover FBI agent, planted the C-4 on the bridge, and attempted to detonate it by cell phone. For his crimes, Stafford received a sentence of ten years in prison.[13]

---

[13]     *Cf. also United States v. Juraboev*, No. 15-CR-95 (E.D.N.Y. 2017) (sentencing defendant affiliated with ISIS who schemed to bomb Coney Island to 15 years imprisonment); *United States v. Naji*, No. 16-CR-653 (E.D.N.Y. 2019) (sentencing defendant to 20 years for providing material support to ISIS outside and within U.S., including attempted Times Square truck bombing); *United States v. Abdin*, No. 17-CR-283 (D.S.C. 2019), *aff'd*, 801 Fed. Appx. 893 (4th Cir. 2020) (20 years for conspiracy to kill for ISIS both outside and within the United States; defendant trained with

Also informative is the case of *United States v. Samantha El Hassani,* prosecuted in the Northern District of Indiana. In that case, Ms. El Hassani, who was sentenced to 6 ½ years, not only travelled to Syria, she married an IS member and recruited others, including women, for her husband to use as slaves. She also allowed her son to be the poster boy in ISIS recruitment videos. *United States v. Samantha El Hassani, 19 CR 159* (N.D.Ind.).[14]

Plainly, the requested sentence, which totals over 12 years of prison and supervised release time, fully accords with sentences meted out for efforts to join ISIS in Syria and similar offenses. By contrast, imposing a Guidelines sentence here would create an unwarranted sentencing disparity, especially given Mr. Ahmed's youth, lack of criminal history, obvious contrition, and demonstrated rehabilitation and attendant low risk of reoffending.

## <u>CONCLUSION</u>

An individualized assessment of the § 3553(a) factors in this case (and the parsimony principle underlying federal sentencing) strongly support a non-Guidelines sentence of the more than five years already served, followed by an additional seven years of supervised release. Parveg Ahmed respectfully requests that the Court impose that sentence upon him.

---

and purchased weapons in support of that goal).

[14]     *See also*, Department of Justice. Office of Public Affairs, *Former Elkhart, Indiana Resident Sentenced to Over Six Years in Prison for Financing of Terrorism* (2020), *at* https://www.justice.gov/opa/pr/former-elkhart-indiana-resident-sentenced-over-six-years-prison-financing-terrorism

*United States v. Parveg Ahmed*
December 7, 2022

Thank you for your attention to this matter.

Respectfully submitted,

/s/

_____
Michael K. Schneider
Federal Defenders of New York, Inc.
1 Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1161

Sabrina P. Shroff
80 Broad Street, 19th Floor
New York, NY 10004
(646) 763-1490

*Attorneys for Mr. Parveg Ahmed*

cc:     Clerk of the Court (by ECF)
        Mr. Craig Heeren, Assistant U.S. Attorney (by email)
        Mr. Joshua G. Hafetz, Assistant U.S. Attorney (by email)
        Mr. Parveg Ahmed (by hand)